# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | Case No. 19-CR-4032-LTS-KEM |
| vs. | ‖ | |
| | ‖ | **REPORT AND** |
| DIEGO FELIPE JUAN, | ‖ | **RECOMMENDATION** |
| Defendant. | ‖ | |

---

Defendant Diego Felipe Juan moves to suppress statements he made during the execution of a search warrant for his residence and while being transported from state custody to his initial appearance in federal court, arguing that he was subject to custodial interrogation without being read his *Miranda* rights. Doc. 19. He also argues that the search warrant for his residence was not supported by probable cause and that the two-day delay in executing the search warrant requires suppression of the evidence seized under the warrant. *Id.*

I held an evidentiary hearing on the motion to suppress on August 14, 2019, at which the following witnesses testified:

- Iowa Division of Criminal Investigation (DCI) Special Agent Jacob Burger; and
- Ernest Nino-Murcia, a certified Spanish interpreter who prepared the transcript constituting Government Exhibit 4.

Doc. 28. I also admitted the following exhibits into evidence:

- Government Exhibit 1 (search warrant materials) (Doc. 27-1);
- Government Exhibit 2 (audio recording of the January 18, 2019 interview);
- Government Exhibit 3 (audio recording of the May 9, 2019 interview); and
- Government Exhibit 4 (transcript made from the audio recording of the January 18, 2019 interview) (Doc. 27-2).

I recommend **granting** the motion to suppress **in part** and **denying** the motion to suppress **in part** (Doc. 19).

## I.     BACKGROUND

Law enforcement received information from the National Center for Missing and Exploited Children (NCMEC) that Facebook user Diego Juan had uploaded a child pornography video and sent it via private message to another user on November 1, 2018 (NCMEC had received this information through a tip from Facebook).  Doc. 27-1 at 10.  Facebook identified the internet protocol (IP) address used to upload the file and access the Diego Juan account, which belonged to Premier Communications and was used in the Doon, Iowa, area.  *Id.*  Through a subpoena to Premier Communications, law enforcement learned that the IP address was issued to Catarina Pablo at a particular residential address in Doon, Iowa, and that Diego Juan was listed as an "authorized user" of the IP address.  *Id.*  The Doon residential address associated with Pablo's Premier Communications account matched the address listed in a public-records search of the name Diego Felipe Juan.  *Id.*  Law enforcement conducted surveillance at this address and observed several cars registered to Pablo.  Agent Burger also viewed the video flagged by Facebook and confirmed it constituted child pornography.

A state magistrate judge signed a search warrant for the address on January 16, 2019, which stated that law enforcement "[we]re hereby commanded to make immediate search of the described place."  Doc. 27-1 at 20.  The residence was not searched until two days later.  Agent Burger testified that agents needed multiple days to plan execution of the search warrant for logistical planning, operational planning, officer safety, and ensuring that the right resources were available on the scene at the time of the execution, especially given that DCI's agents are spread out across the state, and DCI is not a centrally located agency like a local police department.  Agent Burger also testified that

2

during the planning period, he instructed the agents participating in execution of the search warrant not to park their vehicles in a manner blocking in cars at the residence, because he wanted the cars parked at the residence to be able to leave.

Agent Burger testified that because Juan's Facebook posts were in Spanish, Agent Burger contacted Homeland Security Investigations (HSI) (part of the Department of Homeland Security), and two HSI special agents participated in the execution of the search warrant. All in all, eight law enforcement officers were on the scene during the execution of the search warrant—five DCI agents (including Agent Burger); two HSI agents; and a local sheriff's deputy, who arrived sometime during the search (but was not there to begin with). All the law enforcement officers were visibly armed.

Law enforcement arrived at the residence on January 18 sometime before 8:00 a.m. Agents surrounded both the front and back doors to the house and knocked and announced their presence loudly, in English and in Spanish, and the agents at the front door used a battering ram to breach the door. No testimony established how long the officers waited after announcing their presence before resorting to force. When agents entered the house with their weapons drawn, Juan was present, as well as many other family members (adults and children). Agent Burger testified that he encountered Juan near the back door to the house and explained that he was not under arrest and that they were executing a search warrant. Agent Burger testified that HSI Special Agent Ricardo Rocha, who spoke Spanish, translated what Agent Burger had said to Juan. Agent Burger told Juan that he could explain why they were executing a search warrant and answer any questions Juan had in a more private setting, suggesting they go to his car to talk if Juan preferred (most of Juan's family was in the living room at the front of the house). Juan nodded in agreement and asked if he could change clothes first. Juan went into his bedroom, changed, grabbed his coat, and then Juan, Agent Burger, and Agent Rocha went out the back door to Agent Burger's unmarked squad car parked in the alley behind

3

the house. Agent Burger testified that he did not remember whether Juan asked to take his cell phone but that he would not have allowed him to take the phone under standard procedure as it was evidence to be seized under the search warrant.

The interview started around 7:50 a.m. Agent Burger sat in the driver's seat; Juan sat in the front passenger's seat; and Agent Rocha sat in the back middle seat to translate if needed. The doors were unlocked.

Before Agent Burger asked any questions, Juan started talking about a prior encounter with immigration officials in 2013. Agent Burger interrupted, saying "before we get into that," he needed identifying information from Juan. He asked Juan his name and date of birth. Agent Burger then stated he wanted to remind Juan again, as he had said inside, that Juan was not under arrest and that he was free to go. He asked if Juan understood, and when Juan did not say anything, he asked Agent Rocha to translate. Agent Rocha asked Juan in Spanish if he understood, and Juan said no. Doc. 27-2 at 1. Agent Rocha explained to Juan in Spanish that he was not under arrest and that he could "get out of the car or go into [his] house whenever [he] want[s]." *Id.* Juan indicated (in Spanish) that he understood. *Id.* at 2. Agent Burger said that what he had said inside still applied and explained that they were talking in the car for privacy.

Agent Burger asked Juan about his Facebook account and email address under the guise of asking for contact information. When Juan denied ever uploading a video to Facebook or having his Facebook account shut down, Agent Burger said that it was important for Juan to be honest and stated that the search warrant did not relate to his immigration status. After that, Juan admitted that he had sent the child pornography video to his cousin and answered Agent Burger's questions about the video. Some of Agent Burger's questions and Juan's responses were translated informally by Agent Rocha—Agent Rocha conveyed the general meaning of what each person was saying without translating the question or response word-for-word. When Agent Burger finished

questioning Juan, he asked if Agent Rocha had any questions for Juan related to immigration, and Agent Rocha said that he did not. Agent Burger told Juan that they were finished questioning him and that he could go back inside. The interview lasted about thirty minutes. Both Agent Burger and Agent Rocha used a conversational tone during the interview.

After the interview, Juan went back into his residence with the agents, remaining near the back entry while the agents went into the basement to discuss next steps. Ten minutes later, Juan was handcuffed by HSI agents and taken into custody pursuant to a civil immigration detainer. Agent Burger testified that the entire time Juan was in the residence during the execution of the search warrant, an agent was always nearby so as to prevent him from destroying evidence or obtaining a weapon. He also testified that agents remained near Juan's family members at all times.

Six days later, on January 24, 2019, Juan was transferred from immigration detention to state custody on state child pornography charges. The federal grand jury indicted Juan on federal charges on April 25, 2019. Doc. 1. His state charges were dismissed on May 9, 2019.[1] That same day, Agent Burger transported Juan from the jail in Rock Rapids, Iowa, to his initial appearance in this court. Agent Burger showed Juan the federal arrest warrant for his arrest (*see* Govt. Ex. 3, 6:20), placed Juan in a "belly chain" with front handcuffs, and sat him in the front passenger's seat of Agent Burger's unmarked squad car.

During the drive, Juan talked with Agent Burger about his criminal charges. The conversation started when Agent Burger commented on the weather, asked if Juan liked the music playing, and asked if he had eaten, and Juan gave one- or two-word responses.

---

[1] I take judicial notice of this fact from the state court docket (*State v. Juan*, No. 03601 FEC006345 (Lyon County, Iowa)). *See Harrison v. Rabon*, No. 5:12-CV-00328-MP-EMT, 2014 WL 4451622, at *2 n.1 (N.D. Fla. Sept. 10, 2014) (collecting cases taking judicial notice of state court dockets).

Agent Burger then told Juan that they were driving to Sioux City, which would take about an hour and twenty minutes. After about a six-second period of silence, Juan stated that he had a problem and he needed to fix it. Agent Burger asked what he meant, and Juan began discussing his pending charges. Agent Burger commented that it was in the court's hands now and that Juan had good attorneys. Juan continued to discuss his charges, and Agent Burger occasionally asked follow-up questions, some of which appeared to be due to the language barrier and needing Juan to repeat himself to understand what he had said. In addition, when Juan stated that someone had sent him pictures, Agent Burger asked, "what pictures?"; when Juan mentioned the "WhatsApp application" (the phone application from which he had previously told Agent Burger he obtained the child pornography video), Agent Burger asked, "what about it?"; when Juan said something about showing his wife the video, Agent Burger said, "So you showed your wife the video?"; and when Juan said that he had been waiting for people to come to his house after his Facebook account locked because he had sent something bad, Agent Burger asked if Juan had been expecting the officers to come and search his house because his Facebook account locked, and also, "why did the Facebook lock?" Agent Burger testified that originally, he asked questions because he did not understand what Juan was saying, but eventually, he understood Juan to be talking about his pending charges and he began asking follow-up questions aimed at gaining information.

After they had been talking for about four minutes, Agent Burger told Juan that he did not have to talk to him about the charges if he did not want to and that he was not asking him to talk about it. Govt. Ex. 3, 5:03. Juan continued to talk about the video and made a comment about the people who had sent him the video and created it, and Agent Burger replied, "You could always help us with that. . . . Do you know those people? Who added you to the group?" *Id.*, 5:29. When Juan said, "I don't know," Agent Burger said, "You don't get randomly added to that." Juan said something about

6

cleaning his cell phone and people coming up to him (it is hard to understand what Juan said, but he did not seem to mention watching the videos at that point in time), and Agent Burger responded, "Yeah, but you watched the videos too." *Id.*, 5:45. Juan said, "No, not too much," and Agent Burger asked, "How many times?" Juan said something about a lot of videos, and Agent Burger interrupted him to say again that he did not have to talk, and that Agent Burger was not going to ask him any questions but would not prevent him from discussing his case. Agent Burger explained to Juan that the state charges had been dropped and that they were going to Sioux City because there were now similar federal charges pending against him. After a period of silence, Agent Burger asked Juan how long he had lived in Doon, and the pair began talking about Juan's family. For the rest of the recorded conversation, Juan's criminal charges are not discussed. The conversation about Juan's pending charges lasted about six minutes.

## II.    DISCUSSION

Juan argues that the statements he made during the execution of the search warrant and during the drive to his initial appearance must be suppressed, since he was not read his *Miranda* rights on either occasion. He also argues that the evidence seized from his residence during the execution of the search warrant must be suppressed because the warrant was not supported by probable cause and because it was not executed "immediate[ly]."

### A. *Miranda* Rights

Under *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), a suspect subject to custodial interrogation must first be advised that he has the right to remain silent and the right to an attorney, and he must waive these rights before the interrogation can proceed. The Government concedes that the questioning during the execution of the search warrant

7

amounted to an interrogation but argues that Juan was not in custody. The Government also argues that Juan was neither in custody nor interrogated during his transport to his initial appearance. Thus, the Government argues that no *Miranda* violation occurred here. "The government bears the burden of proving by a preponderance of the evidence that a defendant's statements were not the product of a custodial interrogation." *United States v. Koons*, No. CR00-3041-MWB, 2001 WL 34008498, at *8 n.1 (N.D. Iowa Apr. 26, 2001) (citing *Miranda*, 384 U.S. at 475); *see also Holman v. Kemna*, 212 F.3d 413, 418-19 (8th Cir. 2000) ("constru[ing] the ambiguity in the record in favor of [the defendant to] . . . conclude that [the defendant] was subject to interrogation); *United States v. Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1097-98 (D.S.D. 2010) (adopting report and recommendation) (noting that district courts are split regarding the burden of proof and that the Eighth Circuit has not addressed the issue).

### 1. Custody

A suspect is in custody for purposes of *Miranda* upon "formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) (citing *California v. Beheler,* 463 U.S. 1121, 1125 (1983)). The test is not subjective but rather, depends on "how a reasonable [person] in the suspect's position would have understood [the] situation." *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 429 (1984)). The totality of the circumstances must be considered, including the following (nonexhaustive) factors:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to

8

questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002) (quoting ***United States v. Griffin***, 922 F.2d 1343, 1349 (8th Cir. 1990)) (noting the first three factors mitigate against a finding of custody and the last three factors aggravate the existence of custody).

Juan was clearly in custody on May 9, 2019, while being transported to his initial appearance. His state charges had been dismissed; he had been formally arrested on federal charges pursuant to a federal warrant; and he was being transported, handcuffed and with a belly chain, in a police vehicle to his initial appearance in federal court. Juan was not free to leave—he could not have declined to go to his initial appearance or have arranged his own transportation to it—nor would a reasonable person have felt free to do so. At the hearing, I expressed incredulity with the Government's argument otherwise, and the Government stood fast, stating there is an "argument to be made" that although Juan was in custody, he was not in custody for purposes of *Miranda*, citing the Supreme Court's decision in *Howes v. Fields*, 565 U.S. 499 (2012). The Supreme Court's decision in *Howes* relied on the fact that the prisoner in that case was told he was free to leave the room where questioning took place and return to his cell, ***id.*** at 503, 515; here, Juan could not have left Agent Burger's vehicle. *Howes* is inapposite.

Whether Juan was in custody during the interrogation on January 18, 2019, is a closer issue, but I ultimately determine he was not in custody. The execution of the search warrant resulted in a police-dominated environment—seven to eight law enforcement officers were on the scene, surrounding all exits of the residence, and they breached the front door through use of a battering ram and entered the residence with their weapons drawn. But the interview took place in the car with only two officers present, and Juan sat in the front seat with the doors unlocked. The Eighth Circuit has

9

recognized that "[a]ny warrant search is inherently police dominated," but "there is nothing untoward about that circumstance." *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) (quoting *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011)). Instead, the court focuses on the circumstances surrounding the interview itself (rather than the execution of the search warrant as a whole). *See id.*; *Axsom*, 289 F.3d at 502.

Juan's freedom of movement was somewhat limited during the execution of the search warrant, but he could have left the car during questioning and returned to the house if he wished. When Agent Burger first encountered Juan in his residence and told him he could explain what was going on in his car, Juan asked if he could change clothes first, which he was allowed to do. No testimony specifically established whether Juan went unaccompanied into his bedroom, but Agent Burger testified that during the execution of the warrant generally, an agent was always near Juan as well as his family members to ensure that they did not destroy any evidence or access a weapon. In addition, Agent Burger did not allow Juan to take his cell phone with him to the car (but the warrant permitted seizure of Juan's cell phone). Once in the unmarked car, Juan sat in the front passenger seat with the doors unlocked, while Agent Burger sat in the driver's seat and Agent Rocha sat in the back middle seat. At the conclusion of the interview, Juan and the agents went back into the house, and Agent Burger went into the basement to talk with other agents, while Juan stayed near the back door to the house. The limitations to Juan's freedom were reasonable given that the officers were executing a search warrant and wanted to prevent Juan from destroying evidence, and a reasonable person would not have felt unable to leave the car, where questioning occurred.

When Agent Burger first encountered Juan in the residence, he explained that he was not under arrest, that they were executing a search warrant, and that he could explain more and answer any questions in his car if Juan wanted. Agent Rocha translated some of this and relayed it to Juan in Spanish. Once in the car, Agent Burger again reminded

Juan that he did not have to speak with him and that he was free to leave. When Juan indicated he did not understand, Agent Rocha told Juan in Spanish that he was not under arrest and that he could "get out of the car or go into [his] house whenever [he] want[s]." Doc. 27-2 at 1. Juan indicated he understood. *Id.* at 2. Even though Agent Rocha did not specifically say in Spanish that Juan did not have to answer Agent Burger's questions or that he was free to leave, a reasonable person would have understood that by being free to leave the car and go back to the house at any time, the interview could be terminated at any time.

Juan did not initiate conversation with the officers but voluntarily acquiesced. The agents used a conversational tone of voice, and at the end of questioning, Juan returned to the house for ten minutes before being handcuffed (Juan was taken into custody on a civil immigration detainer and not arrested on criminal charges, but I do not find that a reasonable person would understand this distinction to have an effect on the custody analysis). Here, I ultimately find that the totality of circumstances support that a reasonable person would have felt free to leave the car and refuse to answer Agent Burger's questions. *See Williams*, 760 F.3d at 813-15 (holding that defendant was not in custody during execution of a search warrant when officers used a battering ram to gain access to the residence because no one was home; when the defendant arrived during the search, officers asked to question him but told him "that the decision was voluntary and that he was not under arrest"; the interrogation took place on the defendant's "own turf," in his living room; the defendant "was permitted to get a glass of water and to move unsupervised through his home"; although seven armed and uniformed agents were present on the scene, only one agent participated in the interrogation; the interrogation lasted "for a relatively short period of thirty to forty-five minutes"; and the agents departed without arresting defendant); *Perrin*, 659 F.3d at 720-21 (holding that defendant was not in custody during execution of a search warrant when "[a]t least six officers in

tactical gear entered the house" while local officers secured the perimeter; a resident of the household leaving when agents arrived was asked to come back inside; agents gathered the residents of the household in the living room and told them they were free to leave the premises, but if they stayed, they had to remain in the living room, and stated they wanted to ask some questions, but nobody had to answer; a single agent asked to speak to defendant in his bedroom, where he talked with the defendant for ten minutes with the door cracked open; and agents left the residence without arresting defendant); *Axsom*, 289 F.3d at 498, 501-02 (holding that defendant was not in custody during execution of a search warrant in which nine agents entered the house after the defendant let them in, but only two agents participated in interrogation; agents told the defendant that he was not under arrest and that they would like to speak to him if he was willing; interrogation took place in defendant's living room while he smoked a pipe; the defendant's freedom of movement was limited during the interview—an agent stopped him from getting a glass of water and retrieved it for him, and he was escorted by an agent to the bathroom and to his bedroom to change clothes; and the agents departed without arresting defendant); *United States v. Steele*, No. 17-143 (JRT/BRT), 2017 WL 5611557, *1, *3-4 (D. Minn. Nov. 21, 2017) (adopting report and recommendation) (holding that defendant was not in custody during execution of search warrant in which eleven agents were on the scene with weapons drawn, let inside by the defendant's mother; an agent's foot went through defendant's bedroom door and created a hole when defendant attempted to shut the door on the agent; the agent asked defendant whether they could talk outside, and defendant agreed; agents escorted defendant as he moved around the house to change clothes, use the bathroom, and get something to drink prior to the interview; the interrogation took place in an unlocked police van, with defendant and one agent sitting in the back seat and another agent sitting in the front seat; agents told defendant in the van prior to the interview that he "was not under arrest, that he was

free to leave, and that he did not have to talk to [them]," and the defendant expressed a willingness to "have a conversation"; and agents arrested defendant shortly after the conclusion of the interview after consulting with his probation officer).

### 2. *Interrogation*

"Interrogation in the [*Miranda*] context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). As a general rule, "a mere factual statement . . . serv[ing] to inform the suspect as to the status of his case or the investigation into his activities" does not constitute interrogation. *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). Neither does asking "for routine information necessary for basic identification purposes," unless "the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996)). Spontaneous, volunteered statements are not the product of interrogation, and "[a]n officer's request for clarification of a spontaneous statement generally does not constitute interrogation," unless the follow-up question "attempted to enhance [the defendant's] guilt." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (quoting *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989)).

The Eighth Circuit has held that no interrogation occurred when the defendant stated that tribal police had previously told him about the existence of a federal arrest warrant, and the officer "request[ed] . . . clarification" by asking when the defendant knew about the warrant. *Id.* at 445. The Eighth Circuit reasoned that the defendant's spontaneous statement "indicated that he had known about the warrant for some time,

and [the officer] simply asked about the exact length of time." *Id.* at 445-46. The Eighth Circuit has also held that an officer asking what the defendant meant did not amount to interrogation. *See United States v. Jones*, 842 F.3d 1077, 1083 (8th Cir. 2016) (holding that when defendant stated upon his arrest, "[y]ou finally . . . got me," and officer responded by "ask[ing] him what he meant," no interrogation occurred). And in *Butzin*, 886 F.2d at 1017-18, the Eighth Circuit held (on habeas review) that when the defendant requested to speak to an officer and told him he had not been honest the day before, the officer's "ask[ing] . . . what it was that he had not been honest about" was an "attempt to seek clarification of an ambiguous statement," not an interrogation. *See also United States v. Jackson*, 852 F.3d 764, 771-72 (8th Cir. 2017) (holding that when defendant stated he had been using methamphetamine and had not slept in days, he volunteered information about his physical and mental health, and officers could ask follow-up questions that included whether he had any allergies, whether he was taking any prescription medications, and asking him to rate his well-being on a scale of 1-10, and these questions did not amount to an interrogation); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (favorably cited by the Eighth Circuit in *Butzin*) (holding that when officer picked up a notebook during the execution of a search warrant and defendant told the officer he could not take it, officer's response asking "why?" did not amount to interrogation); *United States v. Franklin*, 326 F. Supp. 3d 826, 828-30 (W.D. Mo. 2018) (holding that when defendant interjected into officers' conversation that he had had a baby the night before, the officer's follow-up question asking, "what happened?" did not amount to interrogation; but when defendant repeated himself and the officer responded, "celebrating with PCP," the officer's statement and ensuing conversation constituted interrogation because the "officers' comments implicate[d] [d]efendant in drug possession or usage," which was unrelated to defendant's comment about having a baby the night before, and it was likely "that a person accused of illicit drug use would respond in some

way to comments containing such allegations") (rejecting report and recommendation in part),[2] *appeal filed*, No. 18-3630 (8th Cir. Dec. 11, 2018); ***United States v. Spencer***, No. 18-CR-114 (WMW/HB), 2018 WL 7572495, at *4 (D. Minn. Nov. 30, 2018) (holding that when defendant spontaneously stated upon his arrest that "he was 'innocent man' and 'didn't do nothing, what's going on?," officer's question asking why the defendant had been running amounted to interrogation), *report and recommendation adopted*, 2019 WL 522163 (Feb. 11, 2019); ***United States v. Geraci***, No. CRIM. 12-0134 (DSD/JJG), 2012 WL 3870813, at *4-5 (D. Minn. Aug. 21, 2012) (no interrogation when defendant spontaneously stated he had a gun for his protection, and the officer "attempt[ed] to clarify [his] ambiguous statement" by asking "why?"), *report and recommendation adopted*, 2012 WL 3871347 (Sept. 6, 2012); ***United States v. Tschacher***, No. 4:09CR3025, 2010 WL 2682517, at *1, *5-6 (D. Neb. May 20, 2010) (no interrogation when defendant spontaneously requested officer to retrieve legal papers from his vehicle; officer asked what kind of legal papers; defendant said they related to his firearm possession; officer responded that dispatch had suggested the defendant was a convicted felon; defendant said that was "a crock of crap," that he was fighting this thing and the state refused to deal with it, and that he had the papers to prove it; and officer asked what felony defendant was originally arrested for), *report and recommendation adopted*, 2010 WL 2696154 (July 1, 2010), *and aff'd*, 687 F.3d 923 (8th Cir. 2012); ***United States v. Laroche***, No. CR. 08-30056-01-KES, 2008 WL 4224782, at *2, *5-6 (D.S.D. Sept. 9, 2008) (holding that when defendant was arrested for driving under the influence and eluding, no interrogation occurred when the defendant spontaneously stated, "I gotta do what I gotta do," and the officer responded by asking

---

[2] The magistrate judge found the statement "celebrating with PCP" was not an interrogation because the magistrate judge found (unlike the district court judge) that this comment was not directed at defendant but rather, was a sarcastic remark by one officer to another. ***United States v. Franklin***, No. 17-0244-CR-W-SRB, 2018 WL 4701881, at *4 (W.D. Mo. June 1, 2018).

15

what he meant; but holding that when the defendant spontaneously stated he was the driver of the vehicle, and the officer, knowing a passenger had been present, asked if the driver would take all the blame, the officer's statement amounted to interrogation) (adopting report and recommendation); *United States v. Tail*, No. CR.04-50026-01-KES, 2005 WL 2114227, at *3 (D.S.D. Aug. 31, 2005) (holding that when the defendant spontaneously stated that he knew the officer was there because of a young girl's accusations, the officer's question asking "who that young girl was?" sought clarification of the defendant's first statement and did not amount to interrogation) (adopting report and recommendation), *aff'd*, 459 F.3d 854 (8th Cir. 2006).

Here, during the transport to his initial appearance, Agent Burger spoke first, but it amounted to "polite conversation"—about the weather, the music, and whether Juan had eaten—and to a statement informing Juan about where Agent Burger was taking him; it did not constitute an interrogation. *See Tail*, 459 F.3d at 858 ("Polite conversation is not the functional equivalent of interrogation."); *Hull*, 419 F.3d at 767. After a six-second silence, Juan spontaneously brought up the discussion of his "problem." *See Chipps*, 410 F.3d at 444-45 (holding that when officer started speaking to defendant during the fingerprinting process about the events earlier in the day, and the defendant responded; the defendant's statement after a minute of silence was a spontaneous statement). During the ensuing conversation, Agent Burger asked many questions that appeared aimed at confirming what Juan had said because of the language barrier.[3] Agent Burger also asked follow-up, clarifying questions related to what Juan had said—e.g., when Juan started talking about pornographic videos sent to him on Facebook and mentioned the WhatsApp application (the phone application Juan had previously stated

---

[3] For example, Agent Burger appeared to have a hard time understanding that Juan was saying "porno," at one point asking, "the foreigner video?" in response to Juan saying, "the porno video."

he used to obtain the child pornography video he uploaded to Facebook), Agent Burger asked, "What about it?" Agent Burger's questions were in response to and related to statements Juan made, and Agent Burger did not bring up unrelated facts that Juan had not mentioned. His statements amounted to clarifying follow-up questions, not an interrogation. Accordingly, no *Miranda* warnings were needed.

The one exception involved Agent Burger's statement and question toward the end of the discussion, when Agent Burger commented that Juan "watched the videos too" (Govt. Ex. 3, 5:45) and then asked how many times he had watched the videos (*id.*, 5:49). Juan had made statements earlier in the discussion suggesting that he had viewed the video (although he did not say so outright). Agent Burger's later statement that Juan had "watched the video too" was in response to Juan seemingly suggesting the video was sent to him out of the blue and by people he could not have prevented from doing so. Although close, I find this statement amounted to interrogation. When Juan responded that he had not watched the video "too much," Agent Burger followed up by asking how many times he had watched the video. Because Juan's statement before that question was in response to interrogation, I find the follow-up question to Juan's answer is inadmissible (although the response was largely not understandable). Following that brief exchange, Agent Burger again told Juan he did not need to talk about the case and any subsequent statements should not be suppressed (although no incriminating statements appear to have been made thereafter). Accordingly, I recommend that the district court find no *Miranda* violation occurred, except for the statement about watching the video and follow-up question about the number of times.

### B. Search Warrant

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and

provides that "no [w]arrants shall issue, but upon probable cause." U.S. Const. amend. IV. In accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009). "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (alteration in original) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)). Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence." *United States v. Faulkner*, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] ha[s] also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

Here, the affidavit in support of the warrant provided probable cause to search Juan's residence and electronics for child pornography. Juan's only argument against a finding of probable cause appears to be that some of the information in the warrant "had passed through two prior parties (Facebook and NCMEC)." Doc. 19-1 at 7. Juan does

not cite any case law to support his argument, and he fails to recognize that a tip from a third party can establish probable cause if there is evidence of reliability or corroboration (as here).  *See United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002); *see also United States v. Pippin*, No. CR16-0266-JCC, 2017 WL 3084431, at *1, *5 (W.D. Wash. July 18, 2017) (finding probable cause based on tip from NCMEC, which in turn was based on tip from Google).  Agent Burger viewed the video and confirmed it was child pornography; and he corroborated the tip through records tying Juan's name (from the Facebook account that sent the video) to the IP address used.  He also verified the residence to be searched through the address listed for the IP address; public records of Juan's address; and surveillance of the residence showing cars registered to Catarina Pablo, the name on the account for the IP address.  Moreover, even if the affidavit in support of the warrant failed to provide probable cause, the good-faith exception would bar suppression as a remedy here.  *See United States v. Carpenter,* 341 F.3d 666, 669-70 (8th Cir. 2003) (discussing the good-faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984)).

Juan also argues that the execution of the search warrant violated the Fourth Amendment, because the warrant "commanded . . . immediate search" of the residence, but law enforcement did not search Juan's residence until two days after the warrant was signed.  *See* Doc. 27-1 at 20.  Under Federal Rule of Criminal Procedure 41(e)(2)(A)(i), "[t]he warrant must command the officer to . . . execute the warrant within a specified time no longer than 14 days."  Although the warrant here specified it was to be executed immediately, law enforcement waited two days because they were planning execution of the search warrant amongst DCI agents spread across the state and involving another agency as well (HSI).  The Eighth Circuit has held that a search and seizure is not rendered "warrantless" such that the Fourth Amendment is violated merely because the seizure occurs outside the time specified by the warrant and a minor violation of Rule 41

occurs. *See United States v. Nyah*, 928 F.3d 694, 697, 701-02 (8th Cir. 2019) (holding that when warrant authorized seizure within fourteen days of issuance, the seizure of evidence on the fifteenth day "was 'reasonable' under traditional Fourth Amendment standards"; officers had delivered warrant to Facebook within fourteen days, but Facebook had not complied with the warrant, and the evidence had not been seized, until the fifteenth day, and the court relied on the officers lack of "reckless disregard of proper procedure," as well as the continued existence of probable cause and lack of prejudice to defendant in determining suppression was not an appropriate remedy); *United States v. Gibson*, 123 F.3d 1121, 1124-25 (8th Cir. 1997) (holding that suppression was not required when warrant "commanded the police officers 'to make immediate search," but officers waited four days after issuance to execute the warrant "to provide some protection for the identify and safety of the [confidential] informant"; the court relied on the fact that probable cause had not "dissipated" and "render[ed] the warrant fatally stale"); *see also United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975) ("[I]t is generally accepted . . . that a warrant need only be executed within a reasonable time after its issuance, notwithstanding the presence of "forthwith" language in the warrant."). Here, the delay in execution did not affect the existence of probable cause, and the warrant was executed within a reasonable time (two days) after its issuance. The delay in execution of the warrant does not require suppression.[4]

---

[4] Juan also argues in cursory fashion that "the search and seizure of [his] possessions" violated his Fifth and Fourteenth Amendment rights to due process, relying in part on the agents' use of a battering ram without giving sufficient time for the residents of the house to answer the door voluntarily. *See* Doc. 19-1 at 7-8. He recognizes, however, that the failure to knock and announce, standing alone, "cannot lead to suppression of evidence." *See* 19-1 at 7. I find that the execution of the warrant does not require suppression under due process for the same reasons I discussed in connection with the Fourth Amendment.

### III. CONCLUSION

I respectfully recommend that the district court **grant in part and deny in part** Juan's motion to suppress (Doc. 19). Specifically, I recommend the district court suppress statements made in response to the comment that Juan had watched the video (Govt. Ex. 3, 5:45) and the following question about the number of times he had watched the video (Govt. Ex. 3, 5:49); I recommend the district court deny the remainder of the motion.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. **LCrR 59**. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* **Fed. R. Crim. P. 59**. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 9th day of September, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa